The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and His Honorable Court. Thank you. Please be seated. We're ready for argument on our first case, which is Barnes v. Thomas. Mr. Widenhouse. May it please the Court, I'm Gordon Widenhouse, and along with George Curran, represent William Barnes in this matter. Five years and three days ago, this Court wrote that Mr. Barnes' allegations raised a genuine concern as to the lack of juror impartiality in the case, and did so saying that, to the extent that a juror had a conversation with a third party about the spiritual or moral implications of making this decision, the communication was of such a character as to reasonably draw into question the integrity of the verdict. That language was important because this Court recognized the significance and the fundamental importance of having a fair and impartial jury, a jury, each one of the 12, who makes an independent judgment, not colored by the views or communication of a third party. At the time this Court found the improper communication noted it was of such a character as to call into question the integrity of the verdict. Relying on a previous decision in the full Wood v. Lee case. What's your best evidence from the evidentiary hearing that the jury was tainted by what happened here? I think the best evidence comes in two respects, if Your Honor would allow me to present it in that fashion. There are two things that happened that brought this improper contact to the jury. The first was Holly Jordan, a sitting juror in the case, felt the need to talk to her pastor about the sentencing decision. She did so in the face of 42 admonitions not to talk to anybody about the case. She went to her pastor in the middle of deliberations. Deliberations started on a Wednesday afternoon. Wednesday night she went to a prayer meeting where she went every week. And was all of this in the evidentiary hearing? That is correct. And when we were here, when this court made its decision. I don't want to speak for everybody, but I think I'm at least aware of the underlying facts of what happened before, during the jury deliberations. But my question is, in the evidentiary hearing, what's your best evidence that what happened when she talked to the pastor and then went and pontificated to her colleagues on the jury, that it somehow impacted or tainted the jury's verdict? Well, she testified at the evidentiary hearing. She was afraid she was going to burn in hell. She mentioned burning in hell at least five times during a hearing that didn't last all that long. And because of that fear of potentially burning in hell, she sought counsel from her pastor to get spiritual guidance from a man that she testified at the hearing she considered her spiritual mentor. We understand all those facts, but your burden on remand, the court told you that it's solely on the issue of whether there was a substantial and injurious effect or influence on the jury's verdict. So I think Judge Thacker's question, which is also mine, is what's your best evidence that there was a substantial and injurious effect on the jury? I think maybe I'm not answering the question very well, so I'll give it another shot. Part of my best evidence of the substantial and injurious effect, the natural effect is a juror is so concerned about burning in hell, she goes to talk to her pastor, which she is not permitted to do. She violates her oath. So that single juror, even if we don't look at the others, that single juror perhaps voted the way she did as a result of her fear of burning in hell after she talked to her pastor? Well, no. We know that she was afraid of burning in hell, and she might have voted one way. She then goes and talks to her pastor, who says you won't burn in hell, and reads her a passage from the Old Testament based on all of the record before the court, which says life taken shall be punished by taking life. Not it's okay to think about it. Life shall be taken. The eye for an eye. Eye for an eye. But the language is not just eye for an eye. It's life for a life, and the passage in Exodus says shall be punished by life. Mandatory life. I'm sorry. No, you go ahead. So what's your best evidence that after this conversation, the juror or any of the jurors were swayed to vote one way or the other? I don't think I can prove directly that a juror was swayed one way or the other because of 606B. I can't put a juror on the stand and say, did this change your mind? I can't inquire into that. And so because of 606B, what you have to do is take circumstantial evidence. Right. You may not be able to inquire of the particular juror, but you could ask, which you had the opportunity to do in your Rimmer hearing, ask the jurors that you called as witnesses, well, what was said with respect to returning a verdict as to life or death? So do you have any evidence from any of those witnesses? We know that Ms. Jordan testified, I told the other jurors what my pastor told me. He assured me that we would not burn in hell. She would not have taken that information to the jury room if she didn't think it would help to assuage jurors' concerns. That's the only reason to take that information once she gets it and is satisfied herself. There's no need for her to talk to her fellow jurors unless somebody is concerned. The whole record in this case indicates that at least one juror was crying. The whole record in this case indicates that Ms. Jordan addressed some of what the pastor told her to that juror. And common sense tells you, it seems to me, that she would not go and bring that information to the jury room if she didn't think it would have some influence on one of the other 11 jurors. She is satisfied, she says, once she's met with her pastor, had a sufficient enough discussion that she spent 15 to 30 minutes in the jury room telling her fellow jurors what she and her pastor talked about. So however long she... Following up on Judge Agee's question, at the evidentiary hearing, did you call other jurors than Ms. Jordan? We did. We called two other jurors. We called the jurors we could find after all this time. But we did call Leah Weddington and Ms. Peacock, Ardeth Peacock. Well, in light of Judge Agee's question to you just a few minutes ago, what did they say? Leah Weddington said, when asked, what do you think Ms. Jordan was trying to do, she said, I guess she was trying to influence a juror. So that is some direct evidence from the evidentiary hearing that what she was trying to do, according to Leah Weddington, was convince a juror who was on the fence, presumably about death, that it would be okay to do so. And the court will, I'm sure, and I'm just emphasizing... or whoever was doing the trial work, did she say one way or the other what the verdict should be? And the answer to that was no, she didn't. No, she didn't. There's no evidence that she said what the verdict would be. Well, the government takes the position, I assume, that by addressing this fear of eternal damnation, that simply freed the jury to follow whatever the directions the trial court gave them. It contradicted a closing argument by another lawyer, by a lawyer from Mr. Chambers. If the jury was making a moral judgment, which jurors are entitled to do... Well, why don't you address that question? And I'm not trying to preview what I would assume the government will argue, but if the effect of Ms. Jordan's conversation, both with the pastor and with the other jurors, was that we are now free to do our duty because we're not under stricture of eternal damnation, but we are free to follow whatever the trial court tells us we're supposed to do, how has that been an injurious effect on the jury if they're simply following the court's instructions? Well, my first response to that is she didn't just read a passage that said follow the court's instructions. She reads a passage from the Old Testament that says life taken shall be punished by taking life. That's different than... I thought the pastor told her, and that was her testimony, that she said that the pastor told her that you were to follow the law of the land, whatever that is. The whole record, Judge Agee, in this case indicates she marked three or four passages. Juror Peacock testified one of those was the life for life passage that she read in the jury room. But as going back to Judge Agee's question, did she also say that the pastor told her to follow the law of the land, whatever that is? The evidence in the whole record indicates that she read a passage about the juror's duty is to follow the law, to obey the law, in tandem with passages saying life shall be punished by taking life. And going back to Judge Floyd's question, he asked about other jurors you put on the stand. And you said Weddington, and we heard a little bit about what she testified about. But you also mentioned Ms. Peacock. What did she have to offer? She offered that one of the passages that Juror Jordan read was a life for life passage. So we have, in all candor, I don't know how we could have stronger evidence that this was an improper third-party communication. Jurors are supposed to make their decision based on the evidence in the case following the judge's instructions. There's a talk. But I'm with you on the improper communication, but the next part is that has a substantial and injurious effect on the verdict, on the jury. So that's what. And that language talks about what's the natural effect of the communication. And obviously this court has to make an objective analysis of what the natural effect of these communications would be. But you have 12 jurors that appear to be struggling with what sentence to impose. We have 12 jurors that the record as a whole indicates were bothered by a closing argument. We have 12 jurors, 11 of whom are regular churchgoers. It's a religious jury. And one of the jurors feels strongly enough that she needs to get essentially expert testimony about what kind of sentence can be imposed. But you're not making an objection at this point to the composition of the jury area. I'm — You're not making an objection at this point to the composition of the jury area. Oh, not at all. I'm simply letting the court know that part of the circumstantial evidence that the court would need to look at to determine what effect this improper communication might be is you have a religious jury. You have jurors that are religious, go to church, and one juror goes out and talks to her pastor. And her pastor tells her whatever he tells her. And then she goes back into the jury room and spends 15 to 30 minutes, longer than I'm going to be spending discussing this matter with the panel, about what the pastor told her. So what would be the impact in this analysis of the fact that the jury was a split jury and that it did not give all the co-defendants the death penalty? I don't think there would be any impact because the court has to ask itself is would it have impacted their decision about William Barnes? Right. But of the three co-defendants, didn't the State ask for the death penalty for all three of them? Correct. And certainly — And one of them got life in prison. The one got life in prison testified he wasn't in the house when the murders occurred. And if the jury believed that, they wouldn't be considering the death penalty for him because he wouldn't have been part of the killing itself. But that takes us down a very speculative road now at this point, sitting where we are. I agree. And I don't think the court should go down a speculative road. We have rules in place that jurors are not to talk to third parties. That is a hard and fast rule. Jurors are not supposed to do that. I hate to keep repeating myself. This jury was told 42 times not to do it. They take an oath to follow their instructions. Holly Jordan violates her oath, violates 42 admonitions not to talk to somebody, and goes to talk to her pastor to get spiritual guidance about what to do. If all we had was Jura Jordan talking to her pastor and it stopped there, you'd have a different issue. But she doesn't stop there. She then brings what her pastor has told her to the rest of the jury the next day. She would not do that, I submit, unless she wanted to influence one of the other jurors. That's a reasonable interpretation of what happened. The court, because of 606B, the court has to make a judgment based on circumstantial evidence about what would the effect of a sitting juror talking to her pastor and getting essentially expert testimony, expert guidance about what might happen and what the jury should do. Imagine if the issue before the jury was a question about intellectual disability or what we in the old days called mental retardation. One of the jurors went to her psychotherapist in the middle of the trial and said, there's all this testimony about DSM-5s and IQ scores and whether there's a range of what a score would be. And the psychotherapist says, well, I can tell you how that works and tells her how it works and then she takes that to the other jurors. And the defendant doesn't know about it. He has no opportunity to confront that. The jury is given expert guidance about the ultimate issue in the case, which is precisely what happened here. I mean, if you look at the factors that this court identified in Lawson that you should look at, the degree to which the jury discussed the extrinsic evidence, the evidence that the evidence you're hearing says 15 to 30 minutes, the difficulty the jury was having reaching its decision. If they're not having difficulty, Holly Jordan doesn't go and talk to her pastor and bring the evidence into the jury room. Did the extrinsic evidence relate to a material fact? This panel has already said the extrinsic evidence was the material fact in the case. The timing of the receipt of the extrinsic evidence, right in the middle of deliberations as to the penalty, and then the strength of the overwhelming of the evidence in the case. And with respect to Mr. Barnes, he had substantial evidence of mitigation that I think the district court gave short shrift to the difference between Frank Chambers and William Barnes. Frank Chambers had zero mitigation, none. William Barnes presented substantial evidence, adjustment to incarceration. He had a job. He worked. He had family responsibilities that he had helped with. He had mitigation in the case that could have led one juror, which is all it takes, one juror to return a sentence of life. So that's the situation with William Barnes. He's different, certainly, from Blakeney, who claimed he wasn't there. But the evidence against William Barnes is circumstantial. And would you argue that Juror Jordan, based on her improper communication with her pastor, that it impacted her vote? That's the one juror. I see my red light's on. May I answer the question? Yes, you answer, please. I think it did because she was afraid she might burn in hell. She was concerned enough about the case to violate her oath. All right. Thank you very much. You've got some time on rebuttal, Mr. Babb. Thank you. May it please the Court. This Court remanded this matter to the District Court for an evidentiary hearing to determine whether the State Court's failure to provide rimmer had a substantial injurious effect on the jury's verdict. A review of the testimony from the evidentiary hearing shows that Barnes did not, as this Court required, affirmatively prove actual prejudice. It did not show that the jury's verdict was tainted by the communication between Juror Jordan and Pastor Lomax. Well, but Rule 606 is almost, I mean, it's awfully hard to get around that. And so it looks like we have to evaluate it based on circumstantial evidence. Yes, sir, Your Honor. So you agree we would evaluate it based on, we have to? Yes, I agree with Barnes' counsel that we can't ask a juror, although we know in this case because she gave the answer and counsel for Barnes objected to it after he got the answer. He didn't want to question. We can't, that shouldn't be considered under Rule 606. And what was the question answer you're referring to that counsel for Barnes, you're saying, didn't like the answer to? There's two different situations, and if I could, I'll address how it fits together right now. While Petitioner just argued that Juror Jordan sought guidance on what to do, the record from the evidentiary hearing specifically refutes that argument. And the brief was that she was looking, discussing with her pastor whether to impose the death penalty. Again, the record refutes that. I'm sorry, but I really want to know the answer to my question. What was the question answer that you're saying Barnes' counsel objected to at evidentiary hearing because he didn't like the answer? In fact, it was in two different spots. One was he asked, were you worried about what, this is on JA-2272, were you worried about what to do in the case when you went to talk to Pastor Lomax? Her response, and this was not objected to, her response was, as far as giving him the death sentence, no. I just, I knew what I wanted to do. I mean, I made it up, I was made up in my mind. I just wanted to know if I was going to burn in hell for it. And then counsel for Barnes begins another question and then Juror Jordan at the evidentiary hearing continues on, it wouldn't have made a difference either way. If he had said, yes, you're going to burn in hell, it wouldn't have changed my mind about how I felt what he would have gotten. And at that point, Mr. Widenhouse moved to strike that under Rule 606. Okay, so it wouldn't have changed your, Jordan's mind. Then why did she spend, what are we to do with the fact that she spent half an hour discussing this with the other members of the jury? The goal then, since she had already made up her mind, I mean, it is, does seem to be common sense that the only reason to talk to the other 11 then would be to persuade him somehow, if she had already made up her mind. Yes, ma'am. And the two other jurors that testified at the hearing, Juror Peacock and Juror Weddington testified about, well, Juror Peacock remembers Ms. Jordan reading from the Bible. Juror Weddington doesn't remember the name of the juror, but she remembers a juror reading from a Bible. Both Juror Peacock and Juror Weddington said they could not remember what verses, whether it was Old or New Testament, but Juror Peacock did testify, I do remember the eye for an eye and tooth for a tooth verse. She didn't testify at the evidentiary hearing anything about a life for a life. But she didn't know if it was the old. And what does eye for an eye or tooth for a tooth mean in the context of a death penalty case? Well, that would depend on whether it's coming from Exodus or Matthew, I would assume. And we don't know if it's Old Testament or New Testament. Now, counsel argued that it was Old Testament, and there is a hearsay affidavit from an attorney that was investigating jurors that supports that. And the other site that counsel makes in his brief, reply brief, is to unsworn juror interview notes. But both of those were statements. One was unsworn statements of a juror that didn't testify, and the affidavit was not from the juror, him or herself, but from an attorney. If Juror Jordan had already made up her mind and it didn't matter to her either way, as you just read from the record, what possible reason would there be for her to talk to the rest of the jury about this? Well, she said she was relaying what her pastor told her. But why? It's speculation, as we're sort of stuck with, I guess, here, but it would be to take out the salvation at stake part of the argument. So that they would not be concerned about voting for the death penalty? Or for rejecting the death penalty, because the pastor Lomax's conversation with Juror Jordan, according to Juror Jordan's testimony, was that it was not advocacy for a sentence of death, but it was that we have to live by the laws of the land, and she would not burn in hell for the decision she had to make in the case. And that's JA 2273. So if Juror Jordan's testimony about what her pastor says, and she relayed that to the jurors, it would be to follow the law and it wouldn't have an effect on your salvation. That would be consistent with the trial court. Now, did she relay that to the jury, that they follow the law of the land? I mean, I know the court did. She testified what she was told by her pastor, but the two jurors didn't say she told us to follow the law of the land. What we do have is from Juror Peacock saying, in response to a question from Barnes Counsel, did she state to the jurors, other jurors in your presence, that these Bible verses supported the imposition of the death penalty? And Juror Peacock responded, she did not state they were for the death penalty. She didn't state either way. And that's at 2290 in the joint appendix. When asked by Barnes Counsel a little later again, did she read those passages to affirm it would be okay to oppose the death penalty? Juror Peacock again answered it, JA 2292. She didn't say either way. I did not hear her say either way, which would be consistent with what Juror Jordan's testimony was about what her pastor told her about following the law, which, Your Honor, as you just pointed out, would be what the trial judge said. So the natural effect of that conversation, of this communication with the pastor to Juror Jordan, would not be, as Petitioner argues, to taint the integrity of the verdict, but to help remove the taint of the improper argument and take out the juror's spiritual faith from the equation. Following the law of the land would also include imposing a life sentence. Yes, sir. And that's why I think it's important that the juror says that the Bible verses, and again, Juror Wedding and Juror Peacock said they could not remember the verses. Juror Wedding said she couldn't remember what verses at all. Juror Peacock couldn't remember what verses, but did remember eye for an eye, tooth for a tooth. And I think it is, as the Court has noted, that I think it is an important factor that, or at least some evidence, that the jury didn't view this as, that they gave different sentences to the three defendants, Chambers and Barnes getting death and Blakeney getting life. As the District Court noted, the jury voting against the death penalty for Blakeney provides further evidence the improper contact did not prevent the jury from judging each co-defendant individually and didn't preclude them from rejecting the death penalty as an appropriate punishment. I think that is also evidence. I guess when you look at, the Respondent would say, if you look at the evidence from the hearing, there was no evidence from the jurors that could point to an improper, or excuse me, an injurious, substantial injurious effect on the jury's verdict. Well, you do have testimony from Juror Weddington. She said that she guessed Jordan was trying to convince somebody it was okay to give the death penalty. Yes, sir. And that was my, the next thing I was going to say is, except arguably for that line. However, as the District Court found, that can only be speculation. And finding it is speculation would be consistent with what this Court did in Fullwood regarding an affidavit from a juror trying to testify about an internal thought process of another juror. Given the restrictions of Rule 606, what more could Mr. Barnes' counsel have done to prove a substantial and injurious effect here? What would be enough in the State's view? 606, 606 was not rigorously applied in this case. My objections were not sustained. The only two instances of 606 keeping out evidence was the two that I spoke to earlier. In terms of what Petitioner could do in this case, Or what evidence, not what they could have done, but what evidence would we need to have heard from the jurors to support a substantial and injurious effect? I don't know exactly where to draw that line, but I can say in this case, I don't think there's any evidence that Petitioner could have presented because of what would have happened In response to the questions from counsel, the two jurors, not Juror Jordan, but the other two, had said in the course of the deliberations, Juror Jordan said that the death penalty was required because the Bible mandates it. That's a completely different case, Your Honor, and that's what I'm trying to get at here. I don't think anything could be done in this case because the evidence just doesn't support any allegations like that. Is there any kind of answer that would clearly support a substantial and injurious testimony? Yes, ma'am. I believe so because if you have evidence from Juror Jordan, my pastor told me the death penalty is mandated by God or the Bible. And then the other juror said she came and told us that her pastor said. And, of course, that wouldn't violate Rule 606 because that's that third-party contact. That's not internal and it's bringing it. So that would be evidence that clearly would show a substantial injurious effect on the verdict. Here we have the opposite. According to Ms. Jordan's testimony and consistent with the other two jurors' testimony, the Pastor Lomax didn't say that. In fact, excuse me, she test – Juror Jordan. I shouldn't say she.  I believe that the Bible supported the death penalty or opposed the death penalty. He did not – Juror Jordan's testimony makes it clear Pastor Lomax was not an advocate for the death penalty. And that's, of course, different than the situation this Court was looking at in Fullwood where the allegation was that the husband was an advocate for the death penalty with his wife on the jury. Now, the testimony from Juror Jordan does not show any of that. It shows the preacher told her to follow the laws of the land consistent with what the judge would say and did not mandate any particular result. Now, in terms of viewing Barnes individually or separately, I respectfully disagree about the level of guilt or strength of the case. As the District Court noted, the level of evidence of guilt of Barnes was substantial. Eyewitness testimony, placing with the co-defendants before the crime, contemporaneous statements. In Juror Jordan's testimony about why she talked to the pastor at 2272, she says part of it was, were we going to die because we're killing them? So, she was seeking guidance for more than just her, it sounds like. She says, we, because we're killing him. And then she goes back the next day at the start of deliberations and talks to him about this for 15 to 30 minutes. That is what she, she does testify like that. What are we to do with that? Well, I think the argument from defense counsel was, you're all going to lose your salvation or account spiritual. So, it was collectively to the whole jury. I don't know if Juror Jordan was, but even interpreting it that way, if she is relating to the other members of the jury what the pastor told her, that would not be a substantial injurious effect, because what the pastor told her, again, was follow the law and didn't advocate for any specific result in the, for the death penalty, which was shown by two death sentences and one life sentence, and those defendants being selected individually. Does that answer your question, Your Honor? Yes, thanks. At Barnes, Blake, excuse me, co-defendant Blakely testified Barnes and Chambers shot the victims. Barnes wore jewelry belonging to the victims in an early court appearance. After the murders, Barnes sold one of the murder weapons. Barnes had gunshot residue on his hand and on the waistband of his pants. Strong case of guilt. This conversation with the pastor in response to the improper argument did not have substantial injurious effect. I really, this court could not, was unsure and sent this back, and no evidence at the hearing from the jurors who testified supports, I would argue, a finding of this court by any grave doubt about the harmlessness of the error. This court remanded to give Barnes the opportunity to prove actual prejudice. After an evidentiary hearing with no limitations on the evidence from the three jurors that Barnes called, it is clear there was no actual prejudice to Barnes and there was no substantial injurious effect on the jury's verdict. Respondent asked this court to uphold the district court order denying the writ of habeas corpus. Thank you. Thank you very much. Mr. Woodenhouse, you've got a couple minutes left. Thank you, Your Honor. May it please the court, I'm going to make about four points in rebuttal. The first is I think Judge Thacker may have identified the best evidence for me with regard to what happened when George Jordan says, we were afraid we would burn in hell. That's certainly powerful evidence of why she would take this into the jury room and that it could have had an impact on at least one or more of the jurors. Secondly, the passage that's read that is, eye for an eye, tooth for a tooth, and life for life, is again a mandatory religious statement that life must be followed by life. Life must be taken in response to that. The reasonable inference the court should draw from Holly Jordan taking that passage into the room is at least implicitly to advocate for the death penalty. You don't read that passage to advocate for a life sentence. The third point is it's clear that she would have been reading Old Testament because it talks about life for life. It makes no sense for her to read, and there is absolutely no evidence that she read a passage from the New Testament. Finally, with respect to the strength of the evidence of guilt in the case, the court should not lose sight of the fact that there was no ballistic evidence, no fingerprint evidence, no physical evidence to put Mr. Barnes in the house. There's evidence that he might have had the gun afterwards, that he had some of the booty from the robbery. No evidence puts him in the house. The case is simply not all that strong, given cases where because of the ability of one juror to make a difference, the case comes back to life. I'd like to close by just saying if the state post-conviction court had had the evidence that came out at the evidentiary hearing in this case that they did not have a chance to present because there was no evidentiary hearing and the state post-conviction court had given Mr. Barnes the Rimmer presumption because it would have had to at that point, we would not be here. Thank you. Thank you very much. We'll come down and greet counsel and move on to our next case. Thank you.
judges: G. Steven Agee, Henry F. Floyd, Stephanie D. Thacker